

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-06-325-CV

TEXAS BAY CHERRY HILL, L.P.                              APPELLANT

V.

THE CITY OF FORT WORTH, TEXAS,                          APPELLEES
AND BECKY L. HASKIN

-----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

-----------

## OPINION

-----------

## I.     Introduction

Texas Bay Cherry Hill, L.P. ("Cherry Hill") appeals from a trial court order

granting the City of Fort Worth's plea to the jurisdiction and dismissing Cherry

Hill's claims against former Fort Worth City council member Becky L. Haskin.

This appeal presents four key questions:  (1) whether the City was engaged in

a governmental function—and therefore immune from suit—or a proprietary

function—and therefore subject to suit—when it allegedly committed the acts made the basis of Cherry Hill's claims for business disparagement, tortious interference, and civil conspiracy; (2) whether Cherry Hill's claims for a declaratory judgment and injunctive relief were ripe for determination; (3) whether Cherry Hill stated a claim for inverse condemnation; and (4) whether Haskin was entitled to dismissal of Cherry Hill's claims against her under section 101.106 of the civil practice and remedies code. We affirm.

## II.    Background

Cherry Hill owns the Cherry Hill apartment complex in the Woodhaven neighborhood on the east side of Fort Worth. Woodhaven primarily comprises relatively low-income multifamily apartment complexes, but it also contains a smaller enclave of higher-income single-family homes.

### A.    The Woodhaven redevelopment plan

In 2003, a consulting group prepared a report for the City council recommending the "dispersion of low-income housing units throughout the city." After endorsing the recommendation, the City's Housing and Workforce Development Committee asked City staff to bring forward a project to demonstrate the dispersal and deconcentration of low-income housing. The City selected Woodhaven for the demonstration based on the high concentration of assisted housing and Section 8 units in the neighborhood.

2

The City council hired a consultant, Gideon Toal, to create a Woodhaven master development plan ("the Plan"). The City council also created a steering committee of Woodhaven community volunteers and City officials, including council member Becky Haskin, whose district included Woodhaven. Haskin is also a Woodhaven resident.

The Plan sought to abate high crime rates, reverse declining property values, and achieve a balance of incomes and housing types in Woodhaven. To that end, it recommended the redevelopment of a key Woodhaven intersection—Boca Raton Boulevard and Oakland Hills Drive—as a "neighborhood center" to spur redevelopment in the area. The recommended redevelopment called for the acquisition of two commercial properties and five apartment complexes.

Cherry Hill is one of the apartment complexes. Cherry Hill and the other four apartment complexes in question had unusually high police calls and reported crimes—33% of all police calls to Woodhaven and 30% of all Part I and II crimes.[1] In 2004, providing police and emergency services to the apartment complexes cost the City $4.4 million, while tax revenue from all of Woodhaven was only $0.6 million.

---

[1] Part I and II crimes include homicide, rape, aggravated assault, burglary, and vehicle theft.

3

The Plan identified a $13-$15 million "investment gap" as an obstacle to redevelopment; in other words, the cost of acquisition and redevelopment of the property in question was higher than the redevelopment's expected revenue or sales price, making it extremely unlikely that a private developer would undertake the project. The Plan suggested a public-private partnership to bridge the investment gap and identified several possible financing tools, including implementing tax increment financing, capturing incremental sales and property taxes from site-specific development, borrowing funds from community development block grants, and creating a local development corporation.

Gideon Toal presented a draft of the Plan to the City council on June 28, 2005. On February 14, 2006, after several public hearings and a report from the City manager, the City council passed a resolution endorsing the plan. The Plan, the City manager's report to the City council regarding the Plan, and the resolution adopting the plan all explicitly state that the City will not use its powers of eminent domain to acquire property under the Plan. The City manager recommended that the City encourage the project through economic development incentives, and the City council authorized City staff to "negotiate a public-private partnership for implementation of the goals outlined in the Plan by means of the City's available economic community development incentive

4

tools, as City staff deems appropriate and feasible, including but not limited to, tax abatement and increment financing."

**B.    The City's suit against Cherry Hill**

Meanwhile, in September and October 2004, the City sued Cherry Hill to abate common and public nuisances under chapter 125 of the civil practice and remedies code,[2] alleging that Cherry Hill's apartment complex was a common nuisance under section 125.0015.[3] In January 2005, Cherry Hill and the City signed a rule 11 settlement agreement in which they agreed to abate the lawsuit and cooperate with one another to reduce criminal activity at the Cherry Hill apartments. The City also agreed to dismiss its lawsuit after a year if Cherry Hill fulfilled its end of the bargain, and the City eventually dismissed the lawsuit.

**C.    Cherry Hill's suit against the City**

---

[2]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 125.001-.002, .004, .044-.045, .061 (Vernon Supp. 2007); .003, .042-.043, .046-.047, .062-.069 (Vernon 2005).

[3]*See id.* § 125.0015(b) ("A person maintains a common nuisance if the person maintains a multiunit residential property to which persons habitually go to commit [various criminal acts listed in subsection (a)] and knowingly tolerates the acts and furthermore fails to make reasonable attempts to abate the acts.").

5

In September 2005, Cherry Hill filed this suit against the City, Haskin, and Woodhaven Community Development, Inc., alleging they conspired to diminish the apartment complex's value by disparaging it and tortiously interfered with its business relationships with existing and prospective tenants. Cherry Hill alleged that the City's chapter 125 suit was a sham intended to justify the defendants' statements that the apartments would soon close and be demolished and that the defendants affirmatively steered prospective residents away from the apartments, including Hurricane Katrina refugees. Cherry Hill also sought a declaratory judgment and injunctive relief to stop the City from using its eminent domain powers for economic development.

The City filed an original answer, a plea to the jurisdiction, and a motion to dismiss Cherry Hill's claims against Haskin. Cherry Hill amended its pleading by adding an inverse condemnation claim, a request for a declaration that the Plan is unlawful urban renewal under local government code sections 374.001-.910, and a request to enjoin the City from continuing to fund and participate in the Plan.

After a hearing, the trial court granted the City's plea to the jurisdiction and motion to dismiss Haskin. Cherry Hill nonsuited its claims against Woodhaven Community Development, Inc. and filed this appeal.

III.   The City's Plea to the Jurisdiction

The City's plea to the jurisdiction asserted two key reasons why the trial court lacked jurisdiction over Cherry Hill's claims: (1) the City is immune from suit for the alleged actions made the basis of Cherry Hill's business defamation, tortious interference, and conspiracy claims and (2) Cherry Hill's declaratory judgment action and request for injunctive relief are not ripe for determination.

**A.  Standard of review**

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of the action. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Whether a trial court has subject matter jurisdiction and whether pleadings allege facts that affirmatively demonstrate the trial court's subject matter jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

The determination of whether a trial court has subject matter jurisdiction begins with the pleadings. *Miranda*, 133 S.W.3d at 226. The plaintiff has the burden to plead facts affirmatively showing that the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 220 (Tex. App.—Fort Worth 2003, pet. denied). We construe the pleadings liberally in favor of the pleader,

7

look to the pleader's intent, and accept as true the factual allegations in the pleadings. *See Miranda*, 133 S.W.3d at 226, 228; *City of Fort Worth v. Crockett*, 142 S.W.3d 550, 552 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g).

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *See Bland ISD v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) (confining the evidentiary review to evidence that is relevant to the jurisdictional issue). We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact question will be resolved by the fact-finder. *Id.* at 227–28; *Bland*, 34 S.W.3d at 555. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, however, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 227–28; *Bland*, 34 S.W.3d at 555.

B.    **Governmental immunity**

8

The doctrine of governmental immunity prohibits suits against a governmental entity unless there has been a clear and unambiguous constitutional or statutory waiver of that immunity. *Dallas County MHMR v. Bossley*, 968 S.W.2d 339, 341 (Tex.), *cert. denied*, 525 U.S. 1017 (1998). This immunity from suit defeats a trial court's subject matter jurisdiction, which is never presumed. *Jones*, 8 S.W.3d at 638–39; *Tex. Air Control Bd.*, 852 S.W.2d at 443–44. The legislature granted a limited waiver of immunity in the Texas Tort Claims Act, which permits suits to be brought against governmental units in certain narrowly-defined circumstances. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001); *see also Dallas County MHMR*, 968 S.W.2d at 341.

### 1. Governmental functions versus proprietary functions

A municipality is a governmental entity entitled to sovereign immunity, but only for some of its functions. A municipal corporation exercises two kinds of functions, proprietary functions and governmental functions. *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). Generally speaking, a municipality's proprietary functions are those conducted in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government. *Id.* In contrast, governmental functions concern purely governmental matters solely for the public benefit. *Id*.

Section 101.0215 of the Tort Claims Act contains a nonexclusive list of thirty-six functions the Legislature specifically identified as governmental and three identified as proprietary. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a) (Vernon 2005).[4] If a function is included in this nonexclusive list of governmental functions, the Legislature has deemed it governmental in nature, and we have no discretion or authority to hold otherwise. *Ethio Express Shuttle Serv., Inc. v. City of Houston*, 164 S.W.3d 751, 756 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 357 (Tex. App.—San Antonio 2000, pet. denied).

_____

[4] Section 101.0215(a) provides that the following functions are governmental: (1) police and fire protection and control; (2) health and sanitation services; (3) street construction and design; (4) bridge construction and maintenance and street maintenance; (5) cemeteries and cemetery care; (6) garbage and solid waste removal, collection, and disposal; (7) establishment and maintenance of jails; (8) hospitals; (9) sanitary and storm sewers; (10) airports; (11) waterworks; (12) repair garages; (13) parks and zoos; (14) museums; (15) libraries and library maintenance; (16) civic, convention centers, or coliseums; (17) community, neighborhood, or senior citizen centers; (18) operation of emergency ambulance service; (19) dams and reservoirs; (20) warning signals; (21) regulation of traffic; (22) transportation systems; (23) recreational facilities, including but not limited to swimming pools, beaches, and marinas; (24) vehicle and motor driven equipment maintenance; (25) parking facilities; (26) tax collection; (27) fireworks displays; (28) building codes and inspection; (29) zoning, planning, and plat approval; (30) engineering functions; (31) maintenance of traffic signals, signs, and hazards; (32) water and sewer service; (33) animal control; (34) community development or urban renewal activities undertaken by municipalities and authorized by local government code chapters 373 and 374; (35) latchkey programs conducted exclusively on a school campus; and (36) enforcement of land use restrictions. *Id.*

10

A municipality is liable for torts arising from the exercise of its proprietary functions, but it is generally immune from suit and liability for torts arising from the exercise of its governmental functions, except for the limited waiver provided by the Texas Tort Claims Act. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a), (b) ("A municipality is liable under this chapter for damages arising from its governmental functions . . . .  This chapter does not apply to the liability of a municipality for damages arising from its proprietary functions . . . .").  The proprietary-governmental dichotomy has been used to determine a municipality's immunity from suit for tortious conduct.  *Tooke*, 197 S.W.3d at 343.

Determining a municipality's immunity from suit is a two-step inquiry. *Ethio Express Shuttle Serv., Inc.*, 164 S.W.3d at 754 n.4.  First we determine whether the function is governmental or proprietary.  *Id.*; *Dalon v. City of DeSoto*, 852 S.W.2d 530, 536 (Tex. App.—Dallas 1992, writ denied); *McKinney v. City of Gainesville*, 814 S.W.2d 862, 865 (Tex. App.—Fort Worth 1991, no writ).  If it is governmental, the second step is to determine whether immunity is waived under the Texas Tort Claims Act.  *Ethio Express Shuttle Serv., Inc.*, 164 S.W.3d at 754 n.4; *Dalon*, 852 S.W.2d at 536; *McKinney*, 814 S.W.2d at 865.

11

When determining whether an action is proprietary or governmental, it is contrary to the intent of the Tort Claims Act for the court to focus exclusively on the municipality's conduct without first considering the context within which the conduct occurred. *Inman v. City of Katy*, 900 S.W.2d 871, 873 (Tex. App.—Corpus Christi 1995, no writ) (holding city entitled to governmental immunity for allegedly slanderous statements regarding former police officer made by assistant police chief in the context of a police investigation).

**2.    The City's adoption of the Plan is a governmental function.**

Before turning to the specific conduct Cherry Hill alleged as the basis of its tort claims, we first consider the context in which the conduct occurred. *See id.*  The context in which the conduct occurred—and the backdrop for all of Cherry Hill's claims—is the Plan.  Thus, a threshold question is whether the City's adoption of the Plan is a governmental or a proprietary function.

The Plan arguably falls within four of the thirty-six governmental functions enumerated in the Tort Claims Act: police and fire protection and control; building codes and inspections; zoning, planning, and plat approval; and community development or urban renewal activities undertaken by municipalities and authorized by local government code chapters 373 and 374. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(1), (28)-(29), (34).  The City

12

argues that adoption of the Plan was an exercise of its planning function under section 101.0215(a)(29).  We agree.

"Planning" connotes a systematic development contrived to serve the common interest and contemplates the evolvement of an overall program or design of the present and future development of the total area and services of the municipality.  101A C.J.S. *Zoning & Land Planning* § 2(b) (1979).  The Plan fits neatly into this definition; it laid out a program for the future redevelopment of the Woodhaven area for the common interest.  Because the City's adoption of the Plan was an exercise of its planning power, the adoption of the Plan was a governmental function.

In addition, community development under local government code section 373 closely matches the Plan and its stated objectives.  The Legislature enacted chapter 373 for the express purposes of eliminating slums and areas affected by blight, reducing the geographic isolation of income groups, and alleviating physical and economic distress through the stimulation of private investment and community revitalization in slum or blighted areas, among other things. TEX. LOC. GOV'T CODE ANN. § 373.002(b)(1), (8)-(9) (Vernon 2005).  Chapter 373 authorizes a municipality to adopt a community development program to aid in the prevention or elimination of slums and blighted areas.  *Id.* § § 373.004(3), 373.005(a) (Vernon 2005).  A community development program may include

the demolition of buildings and improvements, including financing of private acquisition of those properties; construction or reconstruction of public works; and the rehabilitation of privately-owned properties. *Id.* § 373.005(b). Chapter 373 authorizes a variety of programs by which a municipality may provide financing for the redevelopment of privately-owned property or to assist private, for-profit entities to carry out an economic development project. *Id.* § 373.005(c), (d). But the chapter does not grant a municipality the power of condemnation to rehabilitate or remove buildings or to acquire real property for the purpose of resale. *Id.* § 373.007(a) (Vernon 2005). A municipality must conduct public hearings on the proposed community development program before adopting the program by resolution or ordinance. *Id.* § 373.006 (Vernon 2005).

The Plan calls for the demolition of certain buildings, the construction or reconstruction of public works, and the rehabilitation of privately-owned properties. It contemplates the use of various financial incentives and tools to finance the redevelopment of private property by private entities. It specifically rejects the use of the City's eminent domain powers to achieve the stated goals. The City held public hearings on the Plan before adopting it by resolution. Thus, the Plan is a community development plan under local government code chapter 373, and the City's adoption of the Plan was the

14

exercise of a governmental function under civil practice and remedies code section 101.0215(a)(34) as well.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(34).

### 3. Business disparagement, tortious interference, and conspiracy claims

Having considered the context in which the City's alleged wrongful conduct occurred, we turn now to the specific wrongful acts alleged by Cherry Hill, beginning with the alleged intentional torts, (1) business disparagement, (2) tortious interference with existing and prospective business relationships, and (3) conspiracy between the defendants to commit business disparagement and tortious interference.

With regard to the business disparagement claim, Cherry Hill specifically alleged the following:

> Defendants Haskin . . . and City (by and through its employees or officials) acting in furtherance of the Defendants' collective or collaborative private and/or proprietary interests, have made statements to the press and/or to the community that Plaintiff is an absentee owner whose property is mismanaged, unsafe for habitation, crime-ridden or otherwise not suitable as apartment dwellings [and] are going to be closed or condemned . . . .

Elsewhere in its petition, Cherry Hill made more specific allegations:

> Haskin and Joe Epps, president of Defendant Development, Inc. have been front and center in this effort.  Both appeared in a news

15

report aired by Fox-4 News on August 23, 2005 in which the public was informed that Plaintiff's apartments, which they found to be offensive, would soon be demolished. Haskin is quoted in the October 4, 2005 Fort Worth Star Telegram stating that Plaintiff's properties are mismanaged.

. . . [T]he City's actual and true agenda was publically revealed by Libby Watson, the City's Assistant City Manager, who is quoted in the October 5, 2005 edition of Fort Worth Weekly as saying that "those three apartment complexes in question were not operating in the manner that we want to have in our community," and "we are not going to place folks in an apartment complex that we don't feel meets a minimal standard."

With regard to its tortious interference claim, Cherry Hill alleged that it "had lease contracts subject to interference, or a reasonable probability of entering into lease contractual relationships, with which one or more of the Defendants willfully and intentionally interfered, and such interference proximately caused actual damages or loss to Plaintiff." The specific acts of interference alleged by Cherry Hill included the statements made the basis of its disparagement claim and the City's failure to include the apartments on a list of housing available for Hurricane Katrina refugees:

Defendants have also affirmatively steered prospective residents of Plaintiff's apartments away from the apartments, including evacuees of the recent hurricane Katrina tragedy, whom the Plaintiff invited to reside at its property on very attractive terms that would assist them in rebuilding their lives. In an effort to ensure the ongoing vacancy of the apartments, the Defendant City consciously elected to exclude Plaintiff's apartments from its list of available housing for Katrina evacuees.

16

In its conspiracy claim, Cherry Hill alleged that the defendants conspired to injure its business and diminish the value of its property via business disparagement and tortious interference.

### a. Governmental or proprietary?

While Cherry Hill's petition described the Plan at length, and it sought declaratory and injunctive relief from the effects of the Plan, it did not specifically reference the Plan in its business defamation, tortious interference, and conspiracy claims. Cherry Hill argues that business defamation and tortious interference are proprietary functions unrelated to the Plan and for which the City has no immunity. The City responds that Cherry Hill's artful pleading cannot avoid the fact that all of its claims arise from the Plan and the exercise of the City's governmental functions.

As we have already noted, the Plan is the backdrop for all of Cherry Hill's allegations and involved the exercise of a governmental function. But the specific statements made the basis of Cherry Hill's disparagement, interference, and conspiracy claims require individual scrutiny to determine whether they, too, involve the exercise of governmental functions. Conduct is not governmental merely because it touches upon a governmental function. *City of Corpus Christi v. Absolute Indus.*, 120 S.W.3d 1, 4 (Tex. App.—Corpus

17

Christi 2001, pet. ref'd) (holding that although garbage removal is a governmental function, city's threat to retaliate against companies that sent their waste to a private landfill—thereby depriving the city of waste-removal revenue—merely touched upon a governmental function).

First we consider the statement allegedly made by Haskin and City employees that Cherry Hill's apartments were mismanaged, unsafe for habitation, crime-ridden, not suitable as apartment dwellings, and subject to closure or condemnation. These alleged statements are directly and closely related to the express reasons for and the goals of the Plan. The alleged statements more than "touch upon" the Plan; they are more like a summary of the Plan itself. Because adoption of the Plan was an exercise of a governmental function, we hold that these alleged statements were also made in the furtherance of a governmental function.

Likewise, the statements allegedly made by Haskin, Epps, and Watson that the apartments were mismanaged, substandard, offensive, and subject to demolition are closely related to the Plan's goals and proposed means of achieving those goals. Moreover, Watson's alleged statement that the apartments were substandard falls within another governmental function specifically enumerated by the Legislature, building codes and inspections. *See*

TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(28). Thus, we hold that these alleged statements were made in the furtherance of a governmental function.

Finally, we consider the allegation that the City steered Hurricane Katrina refugees away from Cherry Hill's apartments, thereby interfering with the prospective business relationship between Cherry Hill and the refugees. The Plan called for the acquisition and demolition of the apartments but identified an investment gap that would discourage private investors from buying and demolishing the apartments and redeveloping the property for other uses. The City directed its staff to narrow the investment gap using the economic tools available for community development. For the City to refer refugees—who might become long-term City residents—to an apartment complex designated for demolition under the Plan runs contrary to the Plan's goals and would only serve to widen the investment gap. Thus, the City's alleged decision not to refer refugees to the apartments was closely related to Plan, and we hold that the decision was the exercise of a governmental function.

> **b.  The City is immune from suit for Cherry Hill's intentional tort allegations.**

Having determined that the intentional torts alleged by Cherry Hill involved the exercise of governmental functions, we must proceed to the second step of the immunity analysis and determine whether immunity is

19

waived under the Tort Claims Act. *See Ethio Express Shuttle Serv., Inc.*, 164 S.W.3d at 754 n.4; *Dalon*, 852 S.W.2d at 536; *McKinney*, 814 S.W.2d at 865.

When a municipality is engaged in a governmental function, its immunity is not waived for claims merely because they arise out of intentional torts. TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2) (providing that governmental immunity is not waived for intentional torts) (Vernon 2005); *Benefit Realty Group v. City of Carrolton*, 141 S.W.3d 346, 349 (Tex. App.—Dallas 2004, pet. denied). The Tort Claims Act permits suit against governmental units for personal injuries or property damage in three general circumstances: personal injuries caused by (1) the use of publicly owned automobiles, (2) a condition or use of tangible personal or real property, and (3) a premises defect, or the condition of real property. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)-(2) (Vernon 2005), 101.022 (Vernon Supp. 2007); *Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.).

Cherry Hill pleaded none of these waivers of immunity, and none appears to be applicable to its allegations. We therefore hold that the City is immune from suit for Cherry Hill's disparagement, interference, and conspiracy claims and that the trial court did not err by granting the City's plea to the jurisdiction on these claims. We overrule Cherry Hill's first issue to the extent that it concerns these claims.

20

**C. Ripeness**

Ripeness is an element of subject matter jurisdiction. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999). A case is not ripe when its resolution depends upon contingent or hypothetical facts or upon events that have not yet come to pass. *Waco ISD v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000). Ripeness, like other justiciability doctrines, derives in part from the constitutional prohibition against advisory opinions, which in turn stems from separation-of-powers principles. *Patterson v. Planned Parenthood of Houston and Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998).

In addition to restraining courts from issuing unconstitutional advisory opinions, ripeness also has a pragmatic, prudential aspect that aims to conserve judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *Patterson*, 971 S.W.2d at 443; *Mayhew*, 964 S.W.2d at 928. These factual and prudential concerns underlie the court's determination of ripeness, in which it considers (1) the fitness of the issues for judicial decision and (2) the hardship occasioned to a party by the court's denying judicial review. *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex. 2001).

### 1. Cherry Hill's declaratory judgment action is not ripe.

Declaratory judgment actions are subject to a ripeness review. *See Firemen's Ins. Co. of Newark, N.J. v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968) (holding Declaratory Judgments Act does not empower courts to issue advisory opinions). Our sister courts have held that a declaratory judgment action is premature if governmental proceedings which will impact the parties' respective rights remain pending. In *Save Our Springs Alliance v. City of Austin*, the court held that the trial court lacked jurisdiction to grant a declaratory judgment that a development agreement was invalid because no permit had yet been issued. 149 S.W.3d 674, 678 (Tex. App.—Austin 2004, no pet.). In *Texas A & M University v. Hole*, the Waco court held that a declaratory judgment action concerning student disciplinary proceedings was not ripe because the students had not yet completed the disciplinary process. 194 S.W.3d 591, 593 (Tex. App.—Waco 2006, pet. denied); *see also Tex. Ass'n of Bus.*, 852 S.W.2d at 444 (holding the Declaratory Judgments Act does not enlarge the court's jurisdiction but merely provides a procedural device for deciding cases already within that jurisdiction).

In its first amended petition, Cherry Hill sought six declarations. Five of the requested declarations expressly relate to the alleged illegality and unconstitutionality of the City's exercise of its eminent domain powers in connection with the Plan. The sixth declaration sought by Cherry Hill indirectly

22

referred to the City's eminent domain power; Cherry Hill sought a declaration that the Plan was illegal under local government code chapter 374 because the City failed to hold an election to designate Woodhaven as a slum or blighted area, and chapter 374 authorizes the use of eminent domain to redevelop such areas. *See* TEX. LOC. GOV'T CODE ANN. §§ 374.011, .016 (Vernon 2005). Thus, all of the declarations sought by Cherry Hill are related to the exercise of the City's eminent domain power in connection with the Plan.

But the Plan expressly states that the City will not use its eminent domain power in connection with the Plan. Moreover, the City council resolution endorsing the Plan states that "the City cannot exercise its powers of eminent domain for the purpose of acquiring property for economic development purposes."

Because the City has expressly stated that it will not use its eminent domain power in connection with the Plan, Cherry Hill's request for a declaration regarding the use of eminent domain in connection with the Plan is not ripe. The declaratory judgment action does not present a real and current controversy; rather, it presents an abstract, hypothetical, and remote dispute. *See Patterson*, 971 S.W.2d at 443; *Mayhew*, 964 S.W.2d at 928. The declaratory judgment claim is not fit for judicial review, and the trial court's refusal to review it presents no hardship to Cherry Hill, which can assert its

23

declaratory judgment action if and when the City does attempt to exercise its eminent domain power. *See Perry*, 66 S.W.3d at 239. Because Cherry Hill's declaratory judgment action is not ripe, the trial court lacked jurisdiction over it. *See Mayhew*, 964 S.W.2d at 928. We therefore hold that the trial court did not err by granting the City's plea to the jurisdiction with regard to Cherry Hill's declaratory judgment action.

### 2. Cherry Hill's request for an injunction is not ripe.

For the same reasons, the trial court did not err by granting the City's plea to the jurisdiction with regard to Cherry Hill's request for injunctive relief. A request for injunctive relief is subject to a ripeness review. *See Tex. A & M Univ.,* 194 S.W.3d at 593 (vacating injunction for lack of ripeness).

Cherry Hill sought an injunction prohibiting the City from participating in the Plan because the Plan threatened Cherry Hill with eminent domain condemnation. Because the City expressly stated that it would not exercise its eminent domain power in connection with the Plan, Cherry Hill's request for injunctive relief is not ripe, and the trial court did not err by dismissing this claim for want of jurisdiction.

Because the trial court properly dismissed Cherry Hill's claims for declaratory judgment and injunctive relief, we overrule the remainder of its first issue.

24

**D. Inverse Condemnation**

We turn now to Cherry Hill's inverse condemnation claim. After the City filed its plea to the jurisdiction, Cherry Hill amended its pleading and alleged that the "City has acted in bad faith to damage Plaintiff's business and diminish the value of Plaintiff's property" and that such acts constituted a taking under article I, section 17 of the Texas Constitution. Cherry Hill identified "steering prospective tenants . . . away from Plaintiff's property" as one basis for its takings claim, but it is otherwise unclear whether the claim is based on the Plan, the City's alleged tortious interference and business disparagement, or some combination thereof. Although the City's plea to the jurisdiction did not address the inverse condemnation claim, the trial court dismissed it along with Cherry Hill's other claims without explanation.

Cherry Hill points out that the City did not challenge the inverse condemnation claim in its plea to the jurisdiction, but it does not explicitly argue that this is grounds for reversal. Even if we construe Cherry Hill's briefs as making this argument, it must fail because subject matter jurisdiction can be raised at any time: "Not only *may* an issue of subject matter jurisdiction be raised for the first time on appeal by the parties or by the court, a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." *Univ. of Tex. Sw. Med. Ctr. at Dallas v.*

25

*Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004); *see Barto Watson, Inc. v. City of Houston,* 998 S.W.2d 637, 639 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (analyzing takings allegations to determine subject matter jurisdiction even though plaintiff asserted takings claim in amended pleading filed after the defendant city filed its plea to the jurisdiction).

Cherry Hill argues that the trial court erred by dismissing its inverse condemnation claim because a governmental entity has no immunity from an inverse condemnation suit. The City concedes that article I, section 17 generally waives its immunity from suit for such claims, but argues that the waiver does not apply when a plaintiff does not allege a "valid" inverse condemnation claim.

The doctrine of governmental immunity does not shield a governmental entity from an action for compensation under the takings clause. *Gen. Servs. Com'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001). But when a plaintiff fails to allege facts that constitute a taking, dismissal for want of jurisdiction is appropriate. *See id*. at 600 (dismissing inverse condemnation claim for want of jurisdiction because allegations did not state a takings claim). Whether alleged facts are enough to constitute a takings claim is a question of law. *Id.* at 598. Thus, we must determine whether Cherry Hill's allegations constitute a takings claim.

To establish a takings claim, a plaintiff must prove (1) the governmental entity intentionally performed certain acts, (2) that resulted in a "taking" of property, (3) for public use. *Gen. Servs. Com'n*, 39 S.W.3d at 598. A taking can be either a physical taking or a regulatory taking. *Mayhew*, 964 S.W.2d at 923.

A physical taking occurs when the government physically authorizes an unwarranted physical occupation of the property. *Id.* Cherry Hill did not allege a physical occupation; thus, it has not alleged a physical taking.

A regulatory taking may occur, in the absence of any physical invasion, by means of a governmental restriction that constitutes an unreasonable interference with the use and enjoyment of the property. *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex. 1994), *cert. denied*, 513 U.S. 1112 (1995). A regulation is a taking if (1) it compels the owner to suffer a physical invasion of the owner's property, *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671 (Tex. 2004); (2) it deprives the owner of all economically beneficial use of the property, *Mayhew*, 964 S.W.2d at 935; or (3) it imposes restrictions that unreasonably interfere with the owner's right to use and enjoy the property, *id.* at 936−37.[5]

_____

[5] The United States Supreme Court recently rejected a fourth theory of regulatory taking, namely, takings arising from regulations that do not

Assuming that the Plan is a "regulation,"[6] Cherry Hill has not alleged facts that raise an issue under the first two theories of regulatory taking. The Plan does not compel Cherry Hill to suffer a physical invasion of its property, and Cherry Hill alleged that the City's action "damage[d] Plaintiff's business and diminish[ed] the value of Plaintiff's property," not that it deprived Cherry Hill of *all* economically beneficial use of the property.

The third theory of regulatory taking, also called the *Penn Central* analysis, is implicated when there is not a complete taking, either physically or by regulation, but the regulation goes "too far," causing an unreasonable interference with the landowner's right to use and enjoy the property. *See Penn Cent. Transp. Co. v. New York*, 438 U.S. 104, 124–25, 98 S. Ct. 2646, 2659 (1978). There is no formulaic test for these ad hoc factual inquiries. *Id.* at 124, 98 S. Ct. at 2659. Nonetheless, factors to be considered include (1) the economic impact of the regulation and (2) the extent to which the

substantially advance legitimate state interests. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 541–45, 125 S. Ct. 2074, 2077–78 (2005). The Texas supreme court has not addressed whether the substantial advancement test remains valid for purposes of Texas Constitutional law in light of *Lingle*. In any event, Cherry Hill has not claimed that the Plan does not advance legitimate state interests.

[6] The other acts alleged by Cherry Hill—business disparagement and tortious interference—are not "regulations" and thus cannot serve as the basis of a regulatory takings claim.

28

regulation interferes with reasonable investment-backed expectations. *Id.*; *see also Sheffield*, 140 S.W.3d at 671–72.

Cherry Hill's allegations raise issues with regard to neither *Penn Central* factor. Because of the Plan's $13-$15 million "investment gap" between the cost of acquiring and developing the property and its anticipated postdevelopment value, no investor has come forward to join the City's proposed "public-private partnership" and put the Plan into action. Thus, the Plan has had no economic impact on Cherry Hill's apartments; or at the very least, the extent of the Plan's economic impact is impossible to discern at this time. *See Williamson County Reg'l Planning Com'n v. Hamilton Bank*, 473 U.S. 172, 181, 105 S. Ct. 3108, 3119 (1985) (holding court lacked jurisdiction over regulatory takings claim when it was impossible to discern what the economic impact of the challenged regulation would be or the extent to which it would interfere with the developer's reasonable investment-backed expectations). Likewise, Cherry Hill has not alleged, and the pleadings and record do not otherwise show, any reasonable investment-backed expectation on Cherry Hill's part nor the Plan's interference with same.

Stated another way, the Plan currently exists only on paper, and unless and until the Plan is implemented, Cherry Hill cannot allege facts that constitute a regulatory taking. Therefore, dismissal for want of jurisdiction is appropriate.

29

*See Gen. Servs. Com'n,* 39 S.W.3d at 598. We overrule Cherry Hill's second issue.

**IV.    Dismissal of Cherry Hill's claims against Haskin**

In its third and fourth issues, Cherry Hill argues that the trial court erred by dismissing its claims against Haskin under section 101.106 of the Tort Claims Act.

**A.    Section 101.106**

After the Tort Claims Act was enacted, plaintiffs often sought to avoid the Act's damages cap or other strictures by suing governmental employees, since claims against them were not always subject to the Act. *Mission Consol. ISD v. Garcia*, Nos. 05-0734, 05-0762, 05-0763, — S.W.3d —, —, 2008 WL 821037, at *2 (Tex. Mar. 28, 2008). To prevent such circumvention, and to protect governmental employees, the Legislature created an election-of-remedies provision. *Id.* As originally enacted, section 101.106, entitled "Employees Not Liable After Settlement or Judgment," provided:

> A judgment in an action or a settlement of a claim under this chapter bars any action involving the same subject matter by the claimant against the employee of the governmental unit whose act or omission gave rise to the claim.

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3305 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 101.106).

30

Employees were thus afforded some protection when claims against the governmental unit were reduced to judgment or settled, but there was nothing to prevent a plaintiff from pursuing alternative theories against both the employee and the governmental unit through trial or other final resolution. *Mission Consol. ISD*, 2008 WL 821037, at *2.

In 2003, as part of a comprehensive effort to reform the tort system, the Legislature amended section 101.106. *Id.* That section, entitled "Election of Remedies," now provides:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

> (b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

> (c) The settlement of a claim arising under this chapter shall immediately and forever bar the claimant from any suit against or recovery from any employee of the same governmental unit regarding the same subject matter.

> (d) A judgment against an employee of a governmental unit shall immediately and forever bar the party obtaining the judgment from any suit against or recovery from the governmental unit.

31

(e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

(f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106.

The revision's apparent purpose was to force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable, thereby reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery. *Mission Consol. ISD*, 2008 WL 821037, at *3; *see also Waxahachie ISD v. Johnson*, 181 S.W.3d 781, 785 (Tex. App.—Waco 2005, pet. denied) (op. on reh'g); *Villasan v. O'Rourke*, 166 S.W.3d 752, 758, 759–60 (Tex. App.—Beaumont 2005, pet. denied). By requiring a plaintiff to make an irrevocable election at the time suit is filed between suing the governmental unit under the Tort Claims Act or proceeding against the employee alone, section 101.106 narrows the issues for trial and reduces delay

32

and duplicative litigation costs. *Mission Consol. ISD*, 2008 WL 821037, at *3. The Act's election scheme is intended to protect governmental employees by favoring their early dismissal when a claim regarding the same subject matter is also made against the governmental employer. *Id.*

**B.     Was Haskin a City employee?**

Cherry Hill first argues that Haskin, in her capacity as City council member, was not a City employee. "Employee," as defined by the Tort Claims Act, means a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control. TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (Vernon 2005). Cherry Hill contends that because the City does not have the legal right to control the details of a council member's tasks, a council member is not an employee.[7] We disagree for three reasons.

---

[7] We find no Texas cases squarely addressing the question of whether a city council member is an employee of the city under the Tort Claims Act. We did not reach the question in *Sanders v. City of Grapevine*, 218 S.W.3d 772, 777 (Tex. App.—Fort Worth 2007, pet. denied) (dismissing for want of jurisdiction interlocutory appeal from dismissal of city council members under section 101.106(e)). The Amarillo court declined to answer the question in *Hohstadt v. Madden*, No. 07-99-00326-CV, 2000 WL 513756, at *4 (Tex. App.—Amarillo Apr. 24, 2000, no pet.) (not designated for publication).

33

First, the City presented uncontroverted evidence that the City paid Haskin for her services as a City council member. Thus, Haskin was "in the paid service of a governmental unit." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2).

Second,

> [t]he Act's definition of 'employee' does not require that a governmental unit control every detail of a person's work. The operator of a motor vehicle, for example, must exercise independent judgment, but this does not mean that he or she cannot be considered an employee under the Act. If it did, a governmental unit could never 'be liable for . . . injury . . . proximately caused by . . . the negligence of an employee . . . aris[ing] from the operation or use of a motor-driven vehicle' even though section 101.021(1) of the Act provides for such liability.

*Murk v. Sheele*, 120 S.W.3d 865, 867 (Tex. 2003) (rejecting argument that physician was not government employee even though exercise of physician's independent professional judgment was outside governmental unit's right of control). Thus, even if the City did not have the legal right to control all of Haskin's work as a council member, this factor does not exclude her from the definition of "employee."

Finally, Haskin's status as an elected official does not place her outside the definition of "employee." Section 101.001(2)'s precursor specifically

34

included "elective" officials in the definition of "employee,"[8] but "elective" and other qualifiers were omitted as superfluous from the definition when article 6252-19 was recodified as chapter 101 of the civil practice and remedies code:

> In the definition of "employee" the source material allowing the employment to be either "full or part-time," "*elective or appointive*," and "supervisory or nonsupervisory" is omitted because the definition is not limited by any of those conditions.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.001 revisor's note (emphasis added). We therefore hold that Haskin, in her capacity as a City council member, was a City employee as defined by the Tort Claims Act.

### C. Individual versus official capacity and "under this chapter"

Cherry Hill next argues that the trial court erred by dismissing its claims against Haskin because it sued her in her individual capacity, not in her official capacity as a City council member, and because it brought none of its claims under the Tort Claims Act. These arguments fail because whether a plaintiff sues a governmental employee in the employee's official or individual capacity is irrelevant under the applicable subsections of section 101.106 and because all tort theories alleged against a governmental unit are assumed to be claims under the Tort Claims Act for purposes of section 101.106.

---

[8] Act of May 14, 1969, 61st Leg., R.S., ch. 292, 1969 Tex. Gen. Laws 874, 875, *repealed by* Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3242, 3322.

In *Mission Consol. ISD*, three terminated school district employees (collectively, "Garcia") sued the district and its superintendent for violations of the Texas Commission on Human Rights Act and various common-law claims that do not fit within the Tort Claims Act's limited waiver of immunity, including claims for defamation, fraud, and intentional infliction of emotional distress. *Id.* at *1. The school district filed a plea to the jurisdiction, arguing that Garcia's decision to sue both the district and the superintendent barred her suit against the district under section 101.106(b). *Id.* The trial court denied the plea, and the Corpus Christi court of appeals affirmed the denial. *Id.*

Before addressing the school district's right to dismissal under 101.106(b), the supreme court considered the effect subsection (e) would have on Garcia's suit against the superintendent if it applied (the district did not move to dismiss Garcia's claims against the superintendent under subsection (e)). *Id.* at *4. The supreme court rejected the court of appeals's conclusion that because Garcia's claims did not fit within the Tort Claims Act waiver of immunity, they were not brought "under this chapter" and that subsection (e) did not apply. *Id.* The supreme court looked to earlier decisions interpreting the former section 106.101. *Id.* In *Newman v. Obersteller*, the court held that former section 101.106's limiting phrase "under this chapter" operated to bar an intentional tort claim against an employee after a final judgment on a claim

36

involving the same subject matter had been rendered against the governmental unit, even though the Act by its terms expressly excluded intentional torts from the scope of the Act's immunity waiver. 960 S.W.2d 621, 622–23 (Tex. 1997). The court cited several other cases reaching the same conclusion under the former section 101.106. *Mission Consol. ISD*, 2008 WL 821037, at *3 (collecting cases). Although these cases construed the prior version of section 101.106, there is nothing in the amended version that would indicate a narrower application of the phrase "under this chapter" was intended. *Id.* Because the Tort Claims Act is the only, albeit limited, avenue for common-law recovery against the government, all tort theories alleged against a governmental unit, whether it is sued alone or together with its employees, are assumed to be "under" the Tort Claims Act for purposes of section 101.106. *Id.* (citing *Newman*, 960 S.W.2d at 622).[9]

---

[9] A different panel of this court reached a different conclusion when interpreting section 101.106(e) in *Meroney v. City of Colleyville*, 200 S.W.3d 707, 714–15 (Tex. App.—Fort Worth 2006, pet. granted, judgment vacated and remanded by agreement) (declining to apply *Newman's* holding to new section 101.106(a) and (e) and holding that subsection (a) did not bar claims against governmental employee in his personal capacity). The supreme court vacated this court's judgment in *Meroney* by agreement of the parties, and our opinion in that case conflicts with, and was therefore overruled by, the supreme court's subsequent interpretation of section 101.106 in *Mission Consolidated ISD. See Mission Consol. ISD*, 2008 WL 821037, at *3–5. Therefore, *Meroney* is not binding precedent.

Therefore, in this case, we must assume that all of Cherry Hill's tort claims against the City—which we have held arise from the exercise of the City's governmental functions—are claims "under" the Tort Claims Act for purposes of section 101.106, despite the fact that Cherry Hill did not invoke or refer to the Tort Claims Act in its pleadings and despite the fact that its tort claims against the City resulted in dismissal as a result of the City's governmental immunity. *See Newman*, 960 S.W.2d at 622 (holding summary judgment in favor of school district on basis of immunity rendered district's employee immune from any further claims under former section 101.106). Thus, subsection 101.106(e) compels dismissal of Cherry Hill's claims against Haskin—assuming the other requirements of section 101.106 are met.

Cherry Hill argues that section 101.106(a) and (e)'s requirements are not met because it sued Haskin in her individual capacity, not in her official capacity as a City employee. A suit against a governmental employee in the employee's individual capacity seeks to impose personal liability on the employee for actions taken under color of state law. *Hidalgo County v. Gonzalez*, 128 S.W.3d 788, 793 (Tex. App.—Corpus Christi 2004, no pet.). A suit against an employee in the employee's official capacity seeks to impose liability on the governmental entity itself. *Id*.; *De Miño v. Sheridan*, 176 S.W.3d 359, 365–66 (Tex. App.—Houston [1st Dist.] 2004, no pet.). To determine whether the

38

capacity in which Cherry Hill sued Haskin matters, we turn again to the statute. When construing a statute, we must determine and give effect to the legislature's intent, considering the statute as a whole and not its provisions in isolation. *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex. 2002). Thus, we will examine the relevant provisions of section 101.106—subsections (a) and (e)—in the context of the entire statute.

Section 101.106(a) expressly provides that "[t]he filing of a suit *under this chapter* against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars *any suit* or recovery by the plaintiff against *any individual employee* of the governmental unit regarding the same subject matter." TEX. CIV. PRAC. & REM. CODE ANN. § 101.206(a) (emphasis added). Subsection (b) is the reciprocal of subsection (a) and provides that "[t]he filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents." *Id.* § 101.106(b). The Legislature's selective inclusion and omission of the phrase "under this chapter" in the two subsections is significant.

In *Waxahachie ISD,* the Waco court held that the omission of the phrase "under this chapter" in subsection (b) means that the subsection applies to suits

39

against an employee in both the employee's official capacity and individual capacity. 181 S.W.3d at 785. "The governmental unit is protected under both situations"; i.e., subsection (b) bars same-subject-matter suits against the government regardless of the capacity in which the plaintiff sued the employee. *Id.*

Subsection (a) also includes the phrase "under this chapter"—but the phrase modifies only "suit . . . against a governmental unit." TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(a). It does not modify "suit . . . against any individual employee." *Id.* Moreover, the words "*any* suit" in subsection (a)—given their plain meaning—mean that *any* same-subject-matter suit against the employee is barred—regardless of the capacity in which the plaintiff sues the employee. The Legislature's inclusion of the modifier "individual" before the word "employee" in subsection (a) but not elsewhere in section 101.106 reinforces this conclusion; read in context, it can only refer to the employee's individual liability. Thus, under subsection (a), a Tort Claims Act suit against a governmental unit bars a same-subject-matter suit against an employee of the governmental unit in both the employee's official and individual capacities. *See id.*

In other words, a suit under the Tort Claims Act against a governmental unit bars a same-subject-matter suit against an employee in both the

40

employee's official and individual capacities. We therefore hold that Cherry Hill's assertion that it sued Haskin only in her individual capacity does not bar dismissal under subsection (e).

### D.    Same subject matter

The sole remaining question is whether Cherry Hill's claims against the City and its claims against Haskin are "regarding the same subject matter." *See id.* § 101.106(a). Cherry Hill asserts the same tort claims against the City and Haskin arising from the same alleged facts. It further alleges that they conspired to commit the torts in question and seeks to hold them jointly and severally liable for its alleged damages. We therefore hold that Cherry Hill's claims against the City and its claims against Haskin regard the same subject matter.

In summary, Haskin is a City employee under the Tort Claims Act. Under section 101.106(a), Cherry Hill's claims against the City bar any suit against Haskin regarding the same subject matter, regardless of whether Cherry Hill sued Haskin in her official or individual capacity. *See id.* Haskin was entitled to dismissal of the claims against her upon filing of the City's motion to dismiss. *See Mission Consol. ISD*, 2008 WL 821037, at *5. We therefore hold that the trial court did not err by granting the motion to dismiss, and we overrule Cherry Hill's third and fourth issues.

41

**V.   Conclusion**

Having overruled all of Cherry Hill's issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL B:   DAUPHINOT, GARDNER, and WALKER, JJ.

DAUPHINOT, J., dissents without opinion.

DELIVERED:  May 29, 2008