

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00211-CV

CITY OF WESTWORTH VILLAGE,                          APPELLANT
TEXAS

V.

CITY OF WHITE SETTLEMENT,                            APPELLEE
TEXAS

----------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 141-290750-17

----------

## OPINION

----------

### I. Introduction

Appellant the City of Westworth Village and its neighbor, Appellee the City of White Settlement, negotiated an economic development plan to locate a Wal-Mart and a Sam's Club on undeveloped property, 66% of which was located in Westworth Village, where the stores would be built, and 34% of which was

located in White Settlement, where the parking lot would be built. This plan led to a contract between the two cities and a property developer that bore fruit when Wal-Mart and Sam's Club selected the proposed site, resulting in an increase in Westworth Village's retail sales tax revenue, some of which, under the parties' agreement, was payable to White Settlement.

Twelve years later, when Westworth Village suffered buyer's remorse based on the "inordinate amount of its police and EMS resources" that it had to devote to the Wal-Mart and Sam's Club without assistance from White Settlement, Westworth Village notified White Settlement of its decision to terminate the agreement.

White Settlement sued Westworth Village for breach of contract. Arguing immunity from suit, Westworth Village filed a plea to the jurisdiction, which the trial court denied. In a single issue in this interlocutory appeal, Westworth Village appeals that denial. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2017). We affirm.

## II. Background

### A. Economic Development in General

Based on our review of the state constitution, statutes, and case law, we understand "economic development" to generally consist of a goal sought or a process used to improve an area's tax base and keep it economically productive by attracting and retaining businesses and jobs through various financial and other incentives. *See generally* Tex. Const. art. III, § 52-a (focusing on state

2

economy's development and diversification to eliminate un- and under-employment and permitting the legislature to enact legislation for economic development); Tex. Loc. Gov't Code Ann. §§ 373.002(a), 374.002(b) (West 2005) (focusing on community development and urban renewal), § 501.004 (West 2015) (focusing on promotion and development of new and expanded business enterprises and job training); Tex. Tax Code Ann. § 311.003 (West 2015) (tax increment financing), § 312.002 (West 2015) (tax abatement agreements); *In re City of Dallas*, 501 S.W.3d 71, 74 (Tex. 2016) (orig. proceeding) (describing conflict between two governmental entities in which one claimed that the other's economic development recruitment effort had caused it to lose approximately 200 jobs, affecting the entity's taxing authorities and businesses); *EP Hotel Partners, LP v. City of El Paso*, 527 S.W.3d 646, 658 n.11 (Tex. App.—El Paso 2017, no pet.) ("[C]ommentators have recognized that it is a common practice for governmental entities to offer 'economic incentives' as a means of attracting corporations to develop projects within their purview in the hope of stimulating local growth and ensuring prosperity."); *Jamro Ltd. v. City of San Antonio*, No. 04-16-00307-CV, 2017 WL 993473, at *1 (Tex. App.—San Antonio Mar. 15, 2017, no pet.) (mem. op.) (describing tax increment financing as a development tool used by municipalities to finance public improvements and infrastructure by leveraging private investment for certain types of development activities); *Mantos v. City of Mansfield*, No. 02-09-00315-CV, 2011 WL 476776, at *1 (Tex. App.—Fort Worth Feb. 10, 2011, no pet.) (mem. op.) ("The City eventually entered into

an economic development agreement affecting the property that included $63,000,000 in tax incentives."); *Tex. Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 386 (Tex. App.—Fort Worth 2008, no pet.) (reciting that city council, to promote a project through economic development incentives, authorized negotiation of a public-private partnership, tax abatement, and tax increment financing); *see also* Martin E. Gold, *Economic Development Projects: A Perspective*, 19 Urb. Law. 193, 193 (1987) (observing that economic development projects are characterized by state, city, and local governments' provision of "various concessions to induce private industry into locating, staying, or expanding within their borders by providing assistance and subsidies for such private development," such as tax exemptions or abatements, for "long-term benefits for the municipality"); Patricia J. Askew, Comment, *Take It or Leave It: Eminent Domain for Economic Development—Statutes, Ordinances & Politics, Oh My!*, 12 Tex. Wesleyan L. Rev. 523, 527 (2006) (defining "economic development" as the "process of site selection and community marketing used to attract and retain businesses and jobs, and ideally prevent, but at least impede, the cycle of economic decline and urban decay" through influencing "the location decisions of private corporations for the benefit of some particular geographic area, . . . local, regional, state, or national" (footnotes omitted)).

Local government code chapter 380, "Miscellaneous Provisions Relating to Municipal Planning and Development," covers economic development programs and grants by certain municipalities. *See* Tex. Loc. Gov't Code Ann. §§ 380.001,

.003 (West 2005), § 380.002 (West Supp. 2017). Section 380.001 allows a city to set up a program for loans and grants of public money "to promote state or local economic development and to stimulate business and commercial activity in the municipality." *Id.* § 380.001(a).

## B. The Contract

Pursuant to local government code chapter 380, on December 15, 2004, Westworth Village, White Settlement, and Allegiance Commercial Development LP entered a contract entitled, "Economic Development Program Grant Agreement Between and Among The City of Westworth Village, the City of White Settlement, and Allegiance Commercial Development, LP." In the contract, Allegiance was listed as the grantee, Westworth Village was listed as "the City," and White Settlement was listed as the assignee. One of the contract's stated purposes was "to promote local economic development and to stimulate business and commercial activity" in Westworth Village.

In the first section of the contract, "Authorization and Purpose," Westworth Village specifically found and acknowledged that participation by Allegiance and White Settlement was essential to the success of the economic development program:

> that the economic benefit to be derived from the business operations on the Property, as defined below, could not have been achieved and will not continue without the cooperation, assistance, performance, and involvement of [Allegiance] and of [White Settlement]. The purpose of this Agreement is to document the terms and conditions under which [Allegiance] will provide land and cause Wal-Mart and Sam's Club retail stores (the "Project") to be

5

developed and located in [Westworth Village,] which will generate more than the amount of financial incentives which [Westworth Village] has herein granted to make such development possible.

White Settlement also specifically acknowledged that the economic benefit to be derived by it from the business operations on the property "could not have been achieved and will not continue without the cooperation, assistance, performance and involvement of Westworth Village."

The essence of the contract is found beginning with the fourth section of the agreement, wherein Westworth Village agreed to make certain periodic payments to White Settlement, first through Allegiance by assignment and later directly. In that section, Westworth Village obligated itself to make monthly program grant payments to White Settlement within fifteen days after receiving its monthly tax payments from the State of Texas. Section five of the agreement covered how the program grant payments would be computed: For the first twelve years of the agreement, the program grant payment would be equal to 50% of Westworth Village's tax collections—defined as the 2% share of all gross sales taxes collected from sales made on the property. This amount would drop to 34% after the first twelve years.

Under the agreement, Allegiance assigned to White Settlement 34% of its 50% share of the applicable retail sales tax collection made by Westworth Village, payable directly to White Settlement. After the first twelve years of the agreement, when Allegiance's 50% share would drop to 34%, Allegiance's shares would be irrevocably assigned from Allegiance to White Settlement for the

6

remainder of the agreement, with Allegiance having no further obligation to either party.

The contract listed the program term as "a period of thirty years and thereafter for so long as there exists on the Property an entity paying city sales tax." By its terms, the agreement would otherwise terminate only upon mutual written agreement of all of the parties to the agreement, except that Allegiance's written agreement would not be required after the first twelve years. The agreement itself was contingent upon approval by both Westworth Village and White Settlement of all plats and the issuance of all permits necessary to build the stores on the property and upon the stores' opening within two years of the agreement's effective date.

Both cities also agreed that if the portion of the property within White Settlement's boundary was ever further developed or redeveloped in such a way as to result in sales taxes being produced from it, they would revise the agreement to provide that White Settlement would receive 34% of all sales tax revenues payable to the two cities from the sales occurring on that portion of the property, and Westworth Village would receive 66% of those sales tax revenues.

The agreement further provided that if any party defaulted on the agreement, within 30 days after delivery of written notice of default, the complaining party, "by action or proceeding at law or in equity, may be awarded specific performance for such default." And it stated, "There are no other agreements among the parties hereto."

7

## C. Contract Termination and Lawsuit

On March 14, 2016, Westworth Village gave approximately six months' advanced notice that it would stop making the agreed payments effective September 30, 2016.  In its notice, Westworth Village described the agreement as "unconscionably unfair to [its] citizens" and the payments as "egregious," and it stated that it believed the agreement to be void for inadequate consideration, terminable at will based on the agreement's perpetual term, and void as against public policy.

White Settlement sued Westworth Village for breach of contract and sought specific performance, with alternative relief in the form of actual damages, attorney's fees, and court costs.  It alternatively claimed that injustice would occur if Westworth Village were not equitably estopped from denying the agreement.

Westworth Village answered with a general denial and, in addition to the grounds set out in its March 14, 2016 notice, Westworth Village raised lack of subject matter jurisdiction based on governmental immunity.  In its subsequent plea to the jurisdiction, Westworth Village contended that it was immune from suit because it had acted in its governmental capacity based on the collection and distribution of sales taxes and redevelopment of property for economic development purposes.  Westworth Village also cited to local government code section 271.152 to argue that the statutory waiver therein did not apply.

Local government code section 271.152 provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

Tex. Loc. Gov't Code Ann. § 271.152 (West 2016). A "contract subject to this subchapter" is one that is in writing and either (1) states the essential terms of the agreement for providing goods or services to the local governmental entity and is properly executed on the entity's behalf or (2) involves the sale or delivery of not less than 1,000 acre-feet of reclaimed water intended for industrial use. *Id.* § 271.151(2)(A)–(B) (West 2016). Because the contract was not for the provision of goods or services, Westworth Village argued that sovereign immunity was not waived under this section.

White Settlement responded by arguing that Westworth Village had entered into the contract in its proprietary, not governmental, capacity, that the agreement was for "goods and services," and that immunity did not apply (1) because the agreement was not about tax collection per se but rather about periodic payments for infrastructure construction, the calculations for which were based on the amount of sales tax and (2) because economic development is not generally considered a governmental function under the Texas Tort Claims Act (TTCA). *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a) (West Supp. 2017) (setting out a nonexclusive list of a municipality's governmental functions).

9

White Settlement further argued that even if the agreement was purely governmental and not a contract for "goods and services," Westworth Village "should be equitably estopped from denying the existence of the 380 Economic Agreement" because Westworth Village had received the full benefits of the agreement, without which the retail development would not have been possible. To its response, White Settlement attached the affidavit of its former mayor, James O. Ouzts, who averred that because Westworth Village could not provide Wal-Mart and Sam's Club with commercial infrastructure—water and sewer—and services that the stores demanded, Westworth Village sought the assistance of White Settlement so that the Wal-Mart and Sam's Club would relocate in the proposed site. Thus, Ouzts explained, under the 380 agreement, White Settlement agreed to provide those benefits. However, contrary to Ouzts's contention, the 380 agreement in evidence does not explicitly state that White Settlement was obligated to perform this function. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (explaining that, following traditional contract construction principles, a court should look to the plain language of the contract to determine the parties' true intent, not what one side or the other alleges that they intended to say but did not).

Ouzts attached to his affidavit a copy of the November 18, 2004 White Settlement City Council meeting minutes at which the agreement with Westworth Village was considered. The minutes reflect that Ouzts had informed the council that the Westworth Village-White Settlement site was the location preferred by

Wal-Mart and Sam's Club, but that "they are also looking at a secondary site in Fort Worth, if we d[o] not come to some kind of agreement with Allegiance Development and West Worth Village then it would mean zero dollars for us as well as West Worth Village."

The trial court denied Westworth Village's plea to the jurisdiction.

## III. Immunity

Westworth Village argues in its single issue that the trial court erred by denying its plea to the jurisdiction when it showed as a matter of law that it was immune from suit under the doctrine of governmental immunity, that the local government code section 271.152 waiver did not apply, and that White Settlement's equitable estoppel argument was meaningless because it had never denied the agreement's existence.

## A. Standard of Review

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of the action. *Tex. Bay Cherry Hill, L.P.*, 257 S.W.3d at 387 (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)). Whether a trial court has subject matter jurisdiction, whether a plaintiff has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction, and whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *see also Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

11

When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause, construing the pleadings liberally in the plaintiff's favor and looking to the pleader's intent. *Miranda*, 133 S.W.3d at 226. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27.

If, however, a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, taking as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Id.* at 227–28. The burden is on the governmental unit as the movant to meet the standard of proof. *Id.* at 228 ("By requiring the state to meet the summary judgment standard of proof . . . , we protect the plaintiffs from having to 'put on their case simply to establish jurisdiction.'"). If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id.* at 227–28. However, if the relevant

evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.[1] *Id.* at 228.

## B. Governmental Immunity

Often incorrectly used as interchangeable terms, sovereign immunity and governmental immunity involve two distinct concepts. *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011) ("Sovereign and governmental immunity are . . . related common law concepts that differ only in scope."); *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 526 S.W.3d 693, 702 (Tex. App.—Houston [14th Dist.] 2017, pet. granted). Sovereign immunity, which refers to the state's immunity, protects the state and its various divisions, including agencies, boards, hospitals, and universities. *Travis Cent. Appraisal Dist.*, 342 S.W.3d at 57–58; *Rosenberg Dev. Corp.*, 526 S.W.3d at 702. Governmental immunity, on the other hand, protects political subdivisions of the state such as counties, cities, and school districts when they perform governmental functions. *Travis Cent. Appraisal Dist.*, 342 S.W.3d at 58; *Rosenberg Dev. Corp.*, 526 S.W.3d at 702. But governmental immunity does not extend to political subdivisions, such as municipalities, for acts committed in the

---

[1]Although Westworth Village stated that its plea challenged White Settlement's original petition, it also stated in its plea that it had attached a copy of the parties' 380 agreement as an exhibit. The record does not contain an exhibit attached to the plea, but White Settlement attached a copy of the agreement to its original petition and to its first amended original petition, which it filed after Westworth Village filed its plea to the jurisdiction. White Settlement also attached a copy of the agreement, along with other items, to its response to the plea.

performance of proprietary functions. *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson I*), 489 S.W.3d 427, 429–30 (Tex. 2016). This so-called proprietary-governmental dichotomy is premised on the derivative nature of governmental immunity. *Id.* at 436 (stating that because a city derives its immunity from the state, it is cloaked in the state's immunity, but "*only* when it acts as a branch of the state"). The dichotomy applies not only to tort claims but also to breach of contract actions against municipalities. *Id.* at 430.

Thus, under the doctrine of governmental immunity, a municipality that enters into a contract in the performance of its governmental function enjoys immunity, unless that immunity is specifically waived by the legislature. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). As to waiver in the context of contract claims against cities, the legislature's determination of which distinctions, exceptions, and limitations should apply is based on, among other things, policy choices regarding what remedies to allow and how to respond to changing conditions for the public welfare, particularly as to the reconsideration of "prior policy decisions reflected in long-term or ill-considered obligations." *Id.* Legislative control ensures that current policy makers are not bound by, or held accountable for, policies underlying their predecessors' long-term contracts. *IT-Davy*, 74 S.W.3d at 854. And to ensure that legislative control is not lightly disturbed, such a waiver of immunity must be clear and unambiguous. *Tooke*, 197 S.W.3d at 332–33.

14

Accordingly, the court must determine, in the first instance, whether immunity exists and its boundaries. *Wasson I*, 489 S.W.3d at 434–35. If immunity exists, then we next consider whether the legislature has waived it. *Id.* at 435; *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 451–52 (Tex. 2016) ("[S]hould we determine the action arose out of the municipality's governmental function, immunity applies and it must be overcome by a claimant establishing a valid waiver."). However, if we determine that the action arose out of a municipality's performance of a proprietary function, rather than a governmental function, we need not consider waiver. *See Wheelabrator*, 489 S.W.3d at 451. Instead, the case proceeds as if the claim were asserted against a private person. *Id.*

### 1. The Proprietary-Governmental Dichotomy

The question before us is whether the agreement here served a governmental or proprietary function. To determine this, we first fix the relevant date of inquiry. In that endeavor, the supreme court has instructed us to look to the nature of the function the municipality was performing when it entered into the contract, not at the time of breach. *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson II*), No. 17-0198, 2018 WL 2449184, at *5, *8 (Tex. June 1, 2018). Thus, "[i]f a municipality contracts in its proprietary capacity but later breaches that contract for governmental reasons, immunity does not apply." *Id.* at *5. "Conversely, if a municipality contracts in its governmental capacity but breaches that contract for proprietary reasons, immunity does apply." *Id.*

15

Next, we look to the nature of the function itself. *See id.* The legislature has defined "proprietary functions" as those that a municipality may, in its discretion and in its private capacity, perform in the interest of the inhabitants of the municipality itself. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(b). In contrast, "governmental functions" generally are those that are public in nature and performed by the municipality as the state's agent in furtherance of the interest of the public at large. *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 776 (Tex. 2006); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a).

The legislature and the state constitution have set out definitional tools to aid our inquiry of whether immunity exists under the proprietary-governmental dichotomy. *Wasson I*, 489 S.W.3d at 438–39 (referencing Tex. Const. art. XI, § 13(a) and the TTCA). While the TTCA supersedes the common law definition of "governmental function" only in claims that fall within the TTCA itself—which does not occur here—the statute is nevertheless helpful because it contains a nonexclusive list of specific, municipal functions that the legislature has deemed to be governmental. *City of White Settlement*, 198 S.W.3d at 776–77; *see* Tex. Const. art. XI, § 13(a) ("[T]he legislature may by law [from 1987 onward] define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law."); *City of Dallas v. City of Corsicana*, Nos. 10-14-00090-CV, 10-14-00171-CV, 2015 WL 4985935, at *2

(Tex. App.—Waco Aug. 20, 2015, pet. denied) (mem. op.) ("[T]he Legislature has given deference to the judiciary to interpret what constitutes a proprietary function only to the extent it is not listed in the statute." (citing *City of Boerne v. Vaughan*, No. 04-12-00177-CV, 2012 WL 2839889, at *2 (Tex. App.—San Antonio July 11, 2012, no pet.) (mem. op.)), *mand. granted*, *In re City of Dallas*, 501 S.W.3d at 74 (directing county court to determine its jurisdiction as to amount in controversy).

Although the list is nonexclusive, the TTCA has identified only three proprietary functions:

> (1)    the operation and maintenance of a public utility;
>
> (2)    amusements owned and operated by the municipality; and
>
> (3)    any activity that is abnormally dangerous or ultrahazardous.

Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(b).

On the TTCA's nonexclusive list of governmental functions, however, the legislature has enumerated 36 functions:

> (1)    police and fire protection and control;
>
> (2)    health and sanitation services;
>
> (3)    street construction and design;
>
> (4)    bridge construction and maintenance and street maintenance;
>
> (5)    cemeteries and cemetery care;
>
> (6)    garbage and solid waste removal, collection, and disposal;

17

(7)   establishment and maintenance of jails;

(8)   hospitals;

(9)   sanitary and storm sewers;

(10)  airports, including when used for space flight activities as defined by Section 100A.001;

(11)  waterworks;

(12)  repair garages;

(13)  parks and zoos;

(14)  museums;

(15)  libraries and library maintenance;

(16)  civic, convention centers, or coliseums;

(17)  community, neighborhood, or senior citizen centers;

(18)  operation of emergency ambulance service;

(19)  dams and reservoirs;

(20)  warning signals;

(21)  regulation of traffic;

(22)  transportation systems;

(23)  recreational facilities, including but not limited to swimming pools, beaches, and marinas;

(24)  vehicle and motor driven equipment maintenance;

(25)  parking facilities;

(26)  tax collection;

18

(27) firework displays;

(28) building codes and inspection;

(29) zoning, planning, and plat approval;

(30) engineering functions;

(31) maintenance of traffic signals, signs, and hazards;

(32) water and sewer service;

(33) animal control;

(34) community development or urban renewal activities undertaken by municipalities and authorized under Chapters 373 and 374, Local Government Code;

(35) latchkey programs conducted exclusively on a school campus under an interlocal agreement with the school district in which the school campus is located; and

(36) enforcement of land use restrictions under Subchapter E, Chapter 212, Local Government Code.

*Id.* § 101.0215(a). If a function is included in the TTCA's nonexclusive list of 36 governmental functions, the legislature "has deemed it governmental in nature," and we are left with "no discretion or authority to hold otherwise." *Tex. Bay Cherry Hill, L.P.*, 257 S.W.3d at 388–89.

At first blush, the contractual obligation here appears to be related to tax collection, *see* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a)(26), an activity that is listed by the TTCA as a governmental function and that has long been recognized in common law as a governmental function. *See City of San Angelo v. Deutsch*, 91 S.W.2d 308, 309 (Tex. 1936). Indeed, this was the primary theory

19

advanced by Westworth Village in its plea to the jurisdiction to support its argument that entering into this agreement was a governmental function. But we agree with White Settlement that in this agreement, tax collection comes into play only as the basis for calculation of the periodic payments due under the agreement. And, as the supreme court has instructed us, the mere "touch[ing] upon" a governmental function is insufficient to render a proprietary action governmental. *Wasson II*, 2018 WL 2449184, at *7. Thus, our analysis cannot stop here.

The underlying economic activity involved may also resemble another of the enumerated governmental functions found in the TTCA, "community development or urban renewal activities undertaken by municipalities and authorized under Chapters 373 and 374, Local Government Code." *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a)(34). But because chapter 373 of the local government code, "Community Development in Municipalities," is limited to "the development of viable urban communities by providing decent housing and a suitable living environment and by expanding economic opportunities for persons of low and moderate income," the agreement here does not implicate chapter 373. *See* Tex. Loc. Gov't Code Ann. § 373.002(a).

Chapter 374, "Urban Renewal in Municipalities," addresses the need to prevent and eliminate slum and blighted areas through "the combined action of private enterprise, municipal regulation, and other public action through approved urban renewal plans." *Id.* § 374.002(b). One of the government code's

20

limitations on the use of eminent domain for economic development purposes is that private property may not be taken for economic development purposes unless the economic development purpose "is a secondary purpose resulting from municipal community development or municipal urban renewal activities to eliminate an existing affirmative harm on society from slum or blighted areas under" local government code chapters 373 or 374. *See* Tex. Gov't Code Ann. § 2206.001(b)(3)(A) (West Supp. 2017). White Settlement described the property as previously undeveloped and not blighted, and there is no evidence in this record to the contrary. Nor is there any evidence in the record that indicates that Westworth Village undertook this agreement pursuant to local government code chapter 374. *Cf.* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a)(34). Instead, the undisputed evidence is that the program here was authorized under chapter 380, not chapters 373 or 374. Because it does not fall within this express provision of the TTCA, we must look further.

## 2. Application of *Wasson II* Analysis

Because the parties' agreement does not fall under the TTCA's express provisions, we must apply the proprietary-governmental dichotomy approach as established by *Wasson II*. *See* 2018 WL 2449184, at *5. As the supreme court has explained, the proprietary-governmental dichotomy approach—a "tool with a particular purpose"—determines whether: (a) immunity applies because a municipality was acting "as a branch" of the state, or (b) immunity does not apply because the municipality was acting "on its own behalf." *Id.* According to the

21

supreme court, a proper analysis requires the application of a four-prong inquiry: (a) whether Westworth Village's act of entering into the contract was mandatory or discretionary; (b) whether the contract was primarily intended to benefit the general public or Westworth Village's residents; (c) whether Westworth Village acted on the state's behalf or its own behalf when it entered the contract; and (d) whether Westworth Village's act of entering into the contract was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.  *Id.* at *5–8; *see also Tex. Bay Cherry Hill, L.P.*, 257 S.W.3d at 388–89.

### a. Was entering into the contract discretionary?

An act is discretionary if it requires exercising judgment and the law does not mandate performing the act with such precision that nothing is left to discretion or judgment.  *Tarrant Reg'l Water Dist. v. Johnson*, 514 S.W.3d 346, 352 (Tex. App.—Fort Worth 2016, pet. granted) (citing *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999), *overruled on other grounds by Denton Cty. v. Beynon*, 283 S.W.3d 329, 331 n.11 (Tex. 2009)); *see Bd. of Trs. of Galveston Wharves v. O'Rourke*, 405 S.W.3d 228, 234 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("A discretionary act is one that requires the exercise of 'personal deliberation, decision and judgment.'").  Chapter 380 allows municipalities to enter into agreements involving economic grant programs like this one, but the language of the statute—through consistent use of the word "may"—indicates that doing so is a discretionary action—a city may take these actions, but it is not

22

required to do so.  *See* Tex. Loc. Gov't Code Ann. § 380.001; *see also* Tex. Gov't Code Ann. § 311.016(1) (West 2013) (stating that "may" creates discretionary authority or grants permission or a power).  Neither side argues that the activities contemplated in this agreement were anything other than discretionary ones.

Based on the record before us, Westworth Village was not required to enter into this agreement or perform the functions contemplated therein, and its decision to do so was purely discretionary.

### b. Was the contract primarily intended to benefit Westworth Village's residents?

Chapter 380 provides that a city "may establish and provide" for the administration of programs "to promote *state or local* economic development and to stimulate business and commercial activity *in the municipality*."  Tex. Loc. Gov't Code Ann. § 380.001(a) (emphasis added).  Thus, according to the statute, the purpose of this agreement could have been to promote state economic development, to promote local economic development, or both.  To determine whether its purpose was to benefit the state, the municipality, or both, we must next look to the agreement itself.

The title of the contract provides the first clue as to its purpose—an "Economic Development Program Grant Agreement" made pursuant to local government code chapter 380 for "*local* economic development."  [Emphasis added.]  Beyond the title, in the body of the contract itself, the agreement recites that its purpose was "to promote local economic development and to stimulate

23

business and commercial activity" in Westworth Village and White Settlement through Westworth Village's sales-tax-funded economic development grant.[2] Nothing in the agreement indicates that these municipalities entered into the contract to benefit the general public or the State of Texas. Thus, even if the development could produce spillover economic benefits to the surrounding areas outside of both municipalities or to the state as a whole, based upon the contract's plain language, both cities acted primarily for the economic benefit of their respective municipalities.

As the supreme court has recently clarified, even though a contract may benefit some nonresidents, the question here is whether it *primarily* benefits residents or *primarily* benefits nonresidents. *See Wasson II*, 2018 WL 2449184, at *6. Based upon this record and the agreement itself, the cities entered into this agreement primarily for the benefit of their own residents, not the general public.

### c. Did Westworth Village act on the state's or its own behalf?

There is no evidence in this record that Westworth Village took these actions as a branch or arm of the state government. To the contrary, every indication in this record is that Westworth Village entered into this agreement on

---

[2]While the parties' contract refers generally to the "cooperation, assistance, performance, and involvement" of White Settlement, it never spells out of what White Settlement's cooperation, assistance, performance, and involvement was to consist.

24

its own behalf.[3]  Thus, we conclude that Westworth Village acted primarily on its own behalf in entering into this agreement.

### d. Was this economic development sufficiently related to a governmental function as to render the act governmental?

The state constitution and statutes have identified some forms of economic development as constituting a public purpose or goal, which in turn could— depending on the facts—be construed as a governmental function for which immunity from suit applies.  A random sampling of the articles of our constitution and our statutes demonstrates how frequently the concept of "economic development" is tied to a state goal and purpose.  For example,

- Article III, section 52-a of the Texas constitution authorizes the legislature to "provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment in the state" and related endeavors.  Tex. Const. art. III, § 52-a.

- Article VIII, section 1-j(a) of the Texas constitution authorizes tax exemptions of goods, wares, merchandise, other tangible personal property, and ores, other than oil, natural gas, and other petroleum

---

[3]That is, Westworth Village does not argue that it entered the agreement on behalf of the state.  It only argues generally that the economic development agreement led to formerly vacant real estate's generating sales tax collections, "resulting in the public good."  *Cf.* Tex. Agric. Code Ann. § 12.0271(b)(2)(D) (West 2018) (providing that economic development funds may only be used for a project relating to "nonretail private enterprises"); Tex. Loc. Gov't Code Ann. § 505.155 (West 2015) (providing that economic development corporations are allowed to undertake projects "to promote or develop new or expanded business enterprises that create or retain primary jobs"), *id.* § 501.002(12)(A) (West 2015) (defining "primary job" to include manufacturing, transportation, warehousing, information, and others, but not listing retail).

products, "[t]o promote economic development in the State" if they meet certain qualifications. *Id.* art. VIII, § 1-j(a).

- Local government code section 501.004(a)(1) states that "the present and prospective right to gainful employment and the general welfare of the people of this state require as a public purpose the promotion and development of new and expanded business enterprises and of job training." Tex. Loc. Gov't Code Ann. § 501.004(a)(1).

- Local government code sections 504.107(b) and 505.106(b) provide that for purposes of the TTCA, a Type A or Type B economic development corporation "is a governmental unit and the corporation's actions are governmental functions." *Id.* §§ 504.107(b), 505.106(b) (West 2015).

- Agriculture code sections 12.027 and 12.0273 allow the state department of agriculture to maintain an economic development program for rural areas. Tex. Agric. Code Ann. §§ 12.027, .0273 (West 2018).

- Education code section 52.63 states, as to college savings bonds, that encouraging enrollment at postsecondary educational institutions "promotes the public welfare and economic development of this state and, consequently, serves an important public purpose." Tex. Educ. Code Ann. § 52.63(2) (West 2012).

- Transportation code section 451.201 states, in a chapter dedicated to metropolitan rapid transit authorities, that "regional economic development facilities" involved in such projects include only those facilities that "will lead to the creation of new jobs, maintain existing jobs, or generally improve the conditions under which a local economy may prosper." Tex. Transp. Code Ann. § 451.201 (West 2013).

- Government code section 481.0069(d)(2) provides that money in the Texas Spaceport Trust Fund may be spent by a development corporation created under local government code chapter 507 if it has demonstrated the financial ability to fund at least 75% of the project. Tex. Gov't Code Ann. § 481.0069(d)(2) (West Supp. 2017).

- Government code sections 481.166 and 481.167 required the Texas Economic Development and Tourism Office to establish a clearinghouse to provide information and assistance to businesses and communities in the state on federal, state, local, and private business development programs and rural and urban community economic development programs and services after finding that "economic development programs and services are located in a number of state agencies," which "need to work together to provide outreach and assistance to local governments and businesses." *Id.* §§ 481.166–.167 (West 2012).

- Government code section 489.101 provided for the creation of an economic development bank to ensure "that communities and businesses in this state have access to capital for economic development purposes." *Id.* § 489.101 (West 2012).

- Water code section 152.151 defines "economic development program" with regard to river authorities engaged in distribution and sale of electricity as a program to encourage economic diversification, to contribute to the health and development of a community to improve its attractiveness to public and private enterprises, or to improve the quality or quantity of services essential for the development of viable communities and economic growth, "including services related to education, transportation, public safety, recreation, health care, training, community planning, or employment." Tex. Water Code Ann. § 152.151 (West 2004).

- Tax code section 313.003 identifies large-scale capital investments, new, high-paying jobs, and expansion of the state's ad valorem tax base as purposes for the Texas Economic Development Act. Tex. Tax Code Ann. § 313.003 (West 2015).

- Health and safety code section 75.001 states that one of the purposes of the regional or local health care programs for employees of small businesses is to "contribute to economic development by helping small businesses remain competitive with a healthy workforce and health care benefits that will attract employees." Tex. Health & Safety Code Ann. § 75.001(3) (West 2017).

- Utilities code section 58.201(a) states that "[i]t is the goal of this state to facilitate and promote the deployment of advanced

telecommunications infrastructure to spur economic development throughout this state." Tex. Util. Code Ann. § 58.201(a) (West 2016).

- Labor code section 303.004(b)(1)(B) requires each public community or technical college providing workforce training under chapter 303 to "identify strategies for improving the delivery of workforce training in order to more effectively impact economic development in this state." Tex. Lab. Code Ann. § 303.004(b)(1)(B) (West Supp. 2017).

Case law, on the other hand, with the exception of tax-related issues, has rarely addressed whether (or which) particular local economic development activities are state governmental *functions* such that they would entitle a city—as opposed to an economic development corporation[4]—to immunity. In considering whether the agreement here is sufficiently related to a governmental function as to render the act governmental, we look to a few of these cases for guidance.

For example, the San Antonio court has held that governmental immunity applies when a city's actions are directed at financing items that fall under one or more of the TTCA's definitions of governmental functions. *Jamro*, 2017 WL 993473, at *4. In *Jamro*, our sister court considered whether the use of tax

---

[4]Valuable discussion regarding the proprietary-governmental dichotomy can also be found in cases involving the question of whether economic development corporations enjoy governmental immunity when performing governmental functions outside of claims under the TTCA. *Compare Rosenberg*, 526 S.W.3d at 706, *with City of Leon Valley Econ. Dev. Corp. v. Little*, 522 S.W.3d 6, 10 (Tex. App.—San Antonio 2017, pet. filed) (mem. op.), *Weir Bros., Inc. v. Longview Econ. Dev. Corp.*, 373 S.W.3d 841, 843, 846 (Tex. App.—Dallas 2012, no pet.), *Purdin v. Copperas Cove Econ. Dev. Corp.*, 143 S.W.3d 290, 304 (Tex. App.—Waco 2004, pet. dism'd) (Gray, C.J., dissenting), *and Rayl v. Borger Econ. Dev. Corp.*, 963 S.W.2d 109, 111, 114 (Tex. App.—Amarillo 1998, no pet.). However, our focus is on the cases dealing with governmental immunity as it relates to municipalities.

increment financing to fund public improvements—streets, alleys, drainage, water, sewer, gas, electricity, street lights/signs, lift station and force main, and open space improvements—for a local development was governmental activity. *Id.* at *1. Jamro, a property developer, urged that the city's activities served a proprietary function, but the court disagreed. *Id.* at *2, *3–4. In affirming the trial court's dismissal based on immunity, the court reasoned that tax code chapter 311 gave the city authority to create a Tax Increment Reinvestment Zone for the benefit of the general public and that the TTCA's list of governmental functions included the items covered by the TIRZ—street construction and design, bridge construction and maintenance, sanitary and storm sewers, waterworks, parks, maintenance of traffic signals and signs, and water and sewer service. *Id.* Thus, the court held that because "the city's actions with regard to the TIRZ were directed at financing public improvements which meet the definition of governmental functions," the city enjoyed governmental immunity for its actions. *Id.* at *4. But *Jamro* predates *Wasson II*, and whether the court would have necessarily reached the same result had it applied *Wasson II*'s four-prong inquiry is uncertain.

The Dallas court has held that the "crux" of the claims raised determines whether a governmental function is implicated. *Douglas v. City of Kemp*, No. 05-14-00475-CV, 2015 WL 3561621, at *4 (Tex. App.—Dallas June 9, 2015, no pet.) (mem. op.). In *Douglas*, the court considered competing arguments regarding a tax abatement to encourage construction of a nursing facility within city limits,

29

which the business owner claimed he never received. *Id.* at *1–2. Douglas argued that the tax abatement was only tangentially related to the city's tax-collection power, and, thus, entirely discretionary. *Id.* at *2. The City of Kemp argued that the action centered on tax assessment and collection, which are "purely and quintessentially governmental functions" for which immunity was not waived. *Id.* at *2, *4. Because the court concluded that tax assessment and collection was a governmental function and that "the crux of Douglas's claims [was] 'invalid tax assessments,'" the court held that the claim "implicate[d] a governmental function" and that the city was immune from suit. *Id.* at *4.

However, in considering a tax abatement in a different context, the Waco court held that such an agreement entered into for the purpose of recruiting a business to relocate to Dallas was a proprietary act, not a governmental function. *City of Dallas*, 2015 WL 4985935, at *3 & n.3, *5. The court reasoned that the recruiting of businesses through tax abatements is a function that "a municipality may, in its discretion, perform and that, in this situation, benefits the citizens of Dallas, rather than the general public at large." *Id.* at *4. Furthermore, the court pointed out, "[b]usiness recruiting is also a function that private persons and entities can and do provide. In other words, it is a proprietary function." *Id.*

We, too, have had an occasion to consider governmental immunity in the context of tax abatements. *See City of Fort Worth v. Pastusek Indus., Inc.*, 48 S.W.3d 366, 368 (Tex. App.—Fort Worth 2001, no pet.). But in *Pastusek*, we conflated sovereign immunity, which applies to the state, its agencies, and its

30

officials, with governmental immunity, which applies to political subdivisions—such as counties, cities, and school districts—only when they perform governmental functions, failing to acknowledge that different standards apply to these terms based on their scope. *Id.*; *cf. Travis Cent. Appraisal Dist.*, 342 S.W.3d at 58 (noting that sovereign and governmental immunity are related common law concepts that differ "only in scope" and observing that their similarity sometimes causes the two terms to be used interchangeably); *Rosenberg Dev. Corp.*, 526 S.W.3d at 697, 702, 706 (explaining that sovereign immunity protects the state, its agencies, board, hospitals, and universities, while governmental immunity protects "political subdivisions of the state, including counties, cities, and school districts, when they perform governmental functions"). We also failed to address the proprietary-governmental dichotomy, and the resulting opinion used "sovereign immunity" to hold that a claim for breach of contract against a municipality, a tax appraisal district, and a school district was barred. *See Pastusek*, 48 S.W.3d at 372. It also applied the concept to a private corporation[5] without discussing how or why that could be. *See id.*

---

[5]In the first paragraph of *Pastusek*, we identified the corporation as "Sunbelt Industrial Development Corporation (SIDC)," but never referred to it again. 48 S.W.3d at 368. Instead, thereafter and throughout the opinion, all appellants—the City of Fort Worth, SIDC, the Tarrant Appraisal District, and the Fort Worth Independent School District—were collectively referred to as "Appellants" and were likewise treated and disposed of in a collective manner. *Id.* at 368–73.

31

In a non-tax-related case, the Dallas court recently found no immunity in a suit involving the leasing of mineral rights on city park land, rejecting the city's argument that because executing oil and gas leases involved the governmental functions of regulation of parks, floodplains, building codes, and zoning, the leasing activity was a governmental function. *City of Dallas v. Trinity E. Energy, LLC*, No. 05-16-00349-CV, 2017 WL 491259, at *2, *5 (Tex. App.—Dallas Feb. 7, 2017, pet. denied) (mem. op.). In reaching its holding, the court of appeals pointed out that a city employee had testified that "the purpose of the leases was 'developing the City's minerals in a safe and efficient manner that both protects the public safety and promotes the maximum revenue for the City.'" *Id.* at *4. From this testimony, the court concluded that "[t]hese functions would benefit the residents within the City's corporate limits, but they would not benefit the public at large, that is, the State." *Id.* Applying *Wasson I* and addressing the proprietary-governmental dichotomy (but without the benefit of *Wasson II*'s four-prong inquiry framework), the court held that because the city's leasing of minerals benefitted the residents within the city's corporate limits and not the public at large, or the state, the city's activity was proprietary, not governmental. *Id.* at *4–5.

Because all of these cases predate *Wasson II*, and three—*Douglas*, *City of Dallas*, and *Pastusek*—also predate *Wasson I*, we rely upon them cautiously. Instead, we must look primarily to *Wasson II*, which reminds us that not all activities "associated" with a governmental function are "governmental." 2018 WL 2449184, at *7. True governmental functions encompass activities that are

32

closely related to or necessary for the performance of the governmental activities designated by statute, and the fact that a city's proprietary action "touches upon" a governmental function is insufficient to render the proprietary action governmental. *Id.* A city's proprietary action may be treated as governmental only if it is *essential* to the city's governmental actions. *Id.* (holding that leasing lakefront property was not "essential" to city's operation or maintenance of lake).

The task of drawing the distinction between proprietary and governmental functions "is not always . . . cut-and-dried." *See id.* at \*8. But what is clear is that to prevail on its plea to the jurisdiction, Westworth Village bore the burden of pleading jurisdictional facts sufficient to meet a summary judgment standard of proof that the activities at issue were governmental, not proprietary, in nature. *See Miranda*, 133 S.W.3d at 226–28. Westworth Village failed to do this: There are no facts in this record to support a finding that any retail jobs that might be at issue here benefitted the state rather than purely the local population. To the contrary, White Settlement's evidence showed that, without the agreement, those retail jobs would have gone elsewhere in the region. *See City of Dallas*, 2015 WL 4985935, at \*1; *see also Wasson II*, 2018 WL 2449184, at \*6 ("A city's proprietary contracts will often benefit some nonresidents, and its governmental contracts will often benefit some residents, but whether a contract *primarily* benefits one or the other will often indicate whether it is proprietary or governmental."); Gold, 19 Urb. Law. at 194–95 ("Virtually all economic

development projects are evaluated, in part, by the number of jobs that will be created or retained.").

We conclude that in light of *Wasson II*, while the 380 agreement "touched" on taxation and planning, *see* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(a)(26), (29), based on the record before us, taking as true all evidence favorable to White Settlement, indulging every reasonable inference and resolving any doubts in White Settlement's favor, as we must, *see Miranda*, 133 S.W.3d at 227–28, the agreement's primary purpose was to foster local economic development to the benefit of the cities' inhabitants rather than to the general public of the state.

Entering into the agreement itself was a discretionary act. Without any evidence showing how the local retail development fostered a benefit primarily to the state or the public in general, or that Westworth Village entered into the agreement as a branch or arm of the state, or that the economic development this agreement fostered was sufficiently related to a governmental function as to render the act governmental, we cannot conclude, under the analysis required by *Wasson II*, that the 380 agreement was undertaken in a governmental capacity. *See* 2018 WL 2449184, at *6–7.

Accordingly, we cannot say that the trial court erred by denying Westworth Village's plea to the jurisdiction, and we overrule Westworth Village's sole issue without reaching White Settlement's chapter 271 and equitable estoppel

34

arguments.[6]  *See* Tex. R. App. P. 47.1; *see also Trinity E. Energy, LLC*, 2017 WL 491259, at \*4 (holding that because city lacked governmental immunity for its acts in its proprietary capacity, there was no need to reach whether local government code chapter 271 waived immunity).

## IV. Conclusion

Having overruled Westworth Village's sole issue, we affirm the trial court's denial of Westworth Village's plea to the jurisdiction and remand this case to the trial court for further proceedings.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; GABRIEL and KERR, JJ.

DELIVERED:  August 9, 2018

---

[6]As discussed above, we would only reach these arguments if Westworth Village has governmental immunity that could either be waived under chapter 271 or be equitably estopped.  *See, e.g.*, *Bexar Metro. Water Dist. v. Educ. & Econ. Dev. Joint Venture*, 220 S.W.3d 25, 32 (Tex. App.—San Antonio 2006, pet. dism'd) (providing that for equitable estoppel to apply to prevent governmental entity from asserting its immunity, the application of estoppel may not interfere with the exercise of the entity's governmental functions and the plaintiff must show that the entity has accepted and retained the benefits arising from the contract).